IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CR-238-1FL(2)

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM &** |
| JAMES NELSON DICKINSON, ) | **RECOMMENDATION** |
| ) | |
| Defendant. ) | |

This matter is before the court on Defendant's motion to suppress [DE #22], which has been referred to the undersigned for memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Government filed a response in opposition to the motion to suppress [DE #25], to which Defendant replied [DE #26]. To further develop the record, the undersigned conducted an evidentiary hearing on May 24, 2017, at which the Government and Defendant, with counsel, appeared. Both parties submitted supplemental briefs after the evidentiary hearing [DE ## 30, 31]. Accordingly, the matter is now ripe for decision.

## STATEMENT OF THE CASE

On September 21, 2016, a federal grand jury returned a one-count indictment charging James Nelson Dickinson ("Dickinson") with possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On February 28, 2017, Dickinson filed the instant motion to suppress. Dickinson contends that he was subjected to an unlawful warrantless automobile search and that evidence was seized in violation of the Fourth Amendment. He demands that any evidence obtained as a

result of that search, including any inculpatory statements made by him, be suppressed. The Government argues that (1) law enforcement had probable cause to effectuate a traffic stop of Dickinson's vehicle, which then led to a lawful search of the vehicle, and (2) even if the search of Dickinson's vehicle was unlawful, inculpatory statements made by Dickinson to law enforcement several months later are purged of the taint of said search. The Government's argument as to the legality of the traffic stop and subsequent automobile search is meritorious, and therefore, the undersigned recommends that Defendant's motion be denied.

## STATEMENT OF THE FACTS

At the evidentiary hearing on Dickinson's motion, Harnett County, North Carolina, Deputy Sheriffs Bradley Abate, Jason Faircloth, and Benjamin Wayne Winstead testified for the Government. Deputy Sheriff Abate also works as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Defendant presented one witness, Investigator Charles Livingston of the Office of the Federal Public Defender for the Eastern District of North Carolina. Based upon the witnesses' testimony and documentary evidence received, the undersigned makes the following findings of fact.

Deputy Winstead works on the traffic unit at the Harnett County Sheriff's Office. He has worked there for nearly five years. (Hr'g Tr. [DE #29] 32.) He previously worked at the Cumberland County, North Carolina, Sheriff's Office for five years. (*Id.*) As of February 2016, Deputy Winstead had worked for Harnett County Sheriff's Office for approximately three and a half years. (*Id.*)

Deputy Faircloth has worked as a Deputy Sheriff for the Harnett County Sheriff's Office since July 2014. (Hr'g Tr. 86.) His law enforcement career began in 2003 with the Sampson County, North Carolina, Sheriff's Office. (*Id.*) In February 2016, Deputy Faircloth was assigned to the traffic unit with the Harnett County Sheriff's Office. (*Id.*)

Deputies Faircloth and Winstead regularly worked together at the Harnett County Sheriff's Office and were familiar with each other in February 2016. (Hr'g Tr. 93.)

In the late evening of February 26, 2016, and early morning hours of February 27, 2016, Deputies Winstead and Faircloth were working a multi-agency traffic checkpoint in Harnett County, North Carolina, on U.S. Highway 421 near the Harnett County and Lee County border. (Hr'g Tr. 6, 86–87.) After their duties at the checkpoint ended around 2:00 a.m., Faircloth and Winstead decided to patrol the area between the towns of Erwin and Linden. (Hr'g Tr. 6, 87–89.) Both deputies were in uniform and operating marked patrol cars. (Hr'g Tr. 7, 36.) The weather was clear and cold that night. (Hr'g Tr. 7, 99.)

Horseshoe Bend Road is a two-lane, state maintained road with a double-yellow center line in Harnett County. (Hr'g Tr. 8.) Passing is prohibited on Horseshoe Bend Road. (*Id.*) The speed limit on Horseshoe Bend Road is fifty-five (55) miles per hour. (Hr'g Tr. 36.) A set of railroad tracks crosses Horseshoe Bend Road; said tracks are slightly elevated (Hr'g Tr. 8–9, 11, 98; Def. Exs. 2A, 2B, 2C), necessitating a state caution sign indicating "rough crossing" before the tracks (Hr'g Tr. 8–9, 11, 98). The

distance from where the railroad tracks intersect Horseshoe Bend Road to the intersection of Horseshoe Bend Road and US Highway 401 is approximately 1.54 miles; the distance along Horseshoe Bend Road from the railroad tracks to the intersection with State Route 217 is approximately six-tenths of a mile. (Hr'g Tr. 38–39; Gov't Ex. 1; Def. Ex. 1.)

Just before 4:00 a.m. on February 27, 2016, Deputy Winstead turned onto Horseshoe Bend Road from State Route 217 to follow a maroon, early 1990s Chevrolet Suburban ("the Suburban").[1] (Hr'g Tr. 8, 35–37.) Deputy Winstead followed the Suburban west on Horseshoe Bend Road until the intersection of Horseshoe Bend Road and U.S. Highway 401. (Hr'g Tr. 8–9, 21; Gov't Ex. 1; Def. Ex. 1.) At the time he turned to follow the Suburban, Deputy Winstead had no reason to follow the vehicle other than that he was on traffic patrol in the area. (Hr'g Tr. 35.) While following the Suburban on Horseshoe Bend Road, Deputy Winstead observed the vehicle's driver-side tires completely cross the double-yellow center line twice—before the railroad tracks for approximately five to ten seconds (Hr'g Tr. 8, 22) and after the railroad tracks for approximately ten seconds (Hr'g Tr. 9, 23). Deputy Winstead also observed the Suburban slightly jump the railroad tracks as it crossed. (Hr'g Tr. 8–9). Deputy Winstead estimated that the Suburban was traveling forty (40) miles per hour on

---

[1] This same vehicle had recently passed Deputy Faircloth, who had stationed his patrol car at the intersection of State Route 217 and Beaver Dam Road, just north of the intersection of State Route 217 and Horseshoe Bend Road in Harnett County. (Hr'g Tr. 89, 100.) When the Suburban passed Deputy Faircloth moments before Deputy Winstead sighted it, Faircloth observed that a taillight was not functioning on the Suburban but decided not to stop the vehicle. (Hr'g Tr. 100–102.)

4

Horseshoe Bend Road. (Hr'g Tr. 11.) There was no other traffic on Horseshoe Bend Road during the time in question. (Hr'g Tr. 11–12, 35.)

After observing the Suburban cross the center line of Horseshoe Bend Road for the second time, Deputy Winstead decided to effectuate a traffic stop for violation of N.C. Gen. Stat. § 20-146(d), which requires vehicles driven on public highways to maintain their lane unless an exception applies. (Hr'g Tr. 9.) Deputy Winstead also suspected the driver of the Suburban might have been intoxicated based on the time of day, the two left-of-center observations, and the speed at which the vehicle crossed the railroad tracks. (Hr'g Tr. 9–10, 29–30.) Deputy Winstead turned on his blue lights but did not immediately activate his siren. (Hr'g Tr. 9–10, 24, 40.) The Suburban did not pull over in response to Deputy Winstead's blue lights as it traveled west on Horseshoe Bend Road despite Deputy Winstead travelling approximately one car length behind the Suburban. (Hr'g Tr. 9–10, 23–24, 41.) As the Suburban and Deputy Winstead approached the intersection with U.S. Highway 401, Deputy Winstead called Deputy Faircloth on the radio and requested that Faircloth drive towards him as backup because the Suburban had failed to pull over. (Hr'g Tr. 10, 42–43.) Deputy Winstead also called dispatch to report the impending traffic stop. (*Id.*)

The Suburban came to a complete stop at a stop sign located at the intersection of Horseshoe Bend Road and U.S. Highway 401, then turned left onto U.S. Highway 401 and drove south towards Cumberland County. (Hr'g Tr. 9–10, 25, 41.) As the Suburban turned left onto U.S. Highway 401 South, Deputy Winstead recognized the vehicle as one he had observed at a residence on Vera Drive near his personal

5

residence. (Hr'g Tr. 12, 15, 74.) Deputy Winstead had received complaints about a particular residence on Vera Drive being a "drug house." (Hr'g Tr. 15, 74.) Deputy Winstead recognized the vehicle due to a gray stripe on its side, which was not visible to him until he observed the Suburban turn onto U.S. Highway 401. (Hr'g Tr. 15–16, 74–75.) Deputy Winstead followed the Suburban onto U.S. Highway 401 South with his blue lights still activated, and signaled his air horn to alert the driver of the Suburban. (Hr'g Tr. 9–10, 25, 42.) The Suburban initially pulled over just before the Cumberland-Harnett county line, then re-entered the lane of travel, and pulled over again just across the Cumberland-Harnett county line where it finally came to a stop on the right side of the road. (Hr'g Tr. 10, 25–26.) Deputy Winstead never observed the Suburban speed or attempt to flee. (Hr'g Tr. 36, 44–45.)

Deputy Winstead exited his patrol vehicle and approached the driver side of the Suburban as it was stopped along the side of U.S. Highway 401 South. (Hr'g Tr. 50.) This area was dark as there are no streetlights. (*Id.*) Because of the poor lighting conditions, Deputy Winstead approached the Suburban with his department-issued flashlight illuminated. (Hr'g Tr. 51–52.) This flashlight projected a beam width approximately the size of a quarter-dollar coin. (*Id.*)

As Deputy Winstead arrived at the driver's side door, Dickinson was leaning over to his right-hand side and then turned back to his left to face Deputy Winstead. (Hr'g Tr. 18, 50.) Dickinson rolled his window down and Deputy Winstead immediately identified himself and explained that he stopped Dickinson for crossing the center line on Horseshoe Bend Road. (Hr'g Tr. 52.) Deputy Winstead was shining

6

his flashlight into the Suburban during this time. (*Id.*) Deputy Winstead asked Dickinson for his driver's license. (Hr'g Tr. 48.)

During the time period between his initial arrival at the driver's side door and Dickinson producing his license, Deputy Winstead observed an unlabeled, clear plastic orange prescription medication bottle on the passenger floorboard of the Suburban. (Hr'g Tr. 48–49, 52, 57.) Deputy Winstead could, with the assistance of his flashlight, see white pills or some other solid white objects in the bottle as the bottle top was facing away from him and was unobscured by a label. (Hr'g Tr. 53–54.) During the brief time (approximately thirty seconds) during which Deputy Winstead spoke with Dickinson while Dickinson retrieved his driver's license, Deputy Winstead observed no evidence of alcohol or marijuana and thus concluded that Dickinson was not impaired. (Hr'g Tr. 57–58.) However, because of his observation of the unlabeled prescription bottle and its contents, Deputy Winstead asked Dickinson "if there was anything in the vehicle that [he] needed to know about" or something to that effect. (Hr'g Tr. 14, 58–59.) Dickinson answered the question in the negative, and then told Deputy Winstead that he could search his person and the vehicle. (Hr'g Tr. 14, 16, 59.) Deputy Winstead then asked Dickinson to step out of the vehicle and escorted him to the area between the rear of the Suburban and the front of Winstead's patrol car. (*Id.*) While walking Dickinson to the rear of the Suburban, Deputy Winstead observed propane tanks, hoses, and lighter fluid in the rear of the vehicle. (*Id.*) Dickinson was not placed in handcuffs at this time. (Hr'g Tr. 59–60.)

Deputy Faircloth arrived on scene while Deputy Winstead was speaking with Dickinson through the driver side window. (Hr'g Tr. 92.) Deputy Faircloth exited his patrol car and approached the passenger side of the Suburban with his flashlight illuminated. (Hr'g Tr. 92, 105.) As he came upon the rear of the Suburban, Deputy Faircloth observed a clear blue plastic container on the center of the rear seat and a camping propane tank in the rear of the vehicle. (*Id.*) With the assistance of his flashlight, Deputy Faircloth observed loose pills, "tissue-type paper," and plastic baggies in the container. (Hr'g Tr. 92, 105–06.)

When Deputy Faircloth arrived at the front passenger door, Deputy Winstead and Dickinson were still talking to one another. (Hr'g Tr. 93.) Deputy Faircloth stood outside the front passenger side door, shined his flashlight into the vehicle, and observed the unlabeled orange pill bottle on the floorboard and a magazine of firearm ammunition on the dashboard. (*Id.*) Deputy Faircloth used hand signals to communicate to Deputy Winstead that there "was something" in the vehicle. (Hr'g Tr. 14, 61, 93.) Deputy Faircloth heard Deputy Winstead ask Dickinson if he was in possession of anything he should not be in possession of, or whether he was in possession of anything illegal.[2] (Hr'g Tr. 94.) Faircloth heard Dickinson answer that question in the negative, and heard Dickinson say that Winstead could search his person and his vehicle. (*Id.*) This question-and-answer took place while Dickinson was still in the vehicle. Then Deputy Faircloth observed Deputy Winstead escort

---

[2] Deputy Faircloth testified that he could not recall the exact wording of the question that Deputy Winstead put to Dickinson. (Hr'g Tr. 94.)

8

Dickinson to the rear of the vehicle. (*Id.*) After Dickinson exited the vehicle and accompanied Deputy Winstead to the rear of the Suburban, Deputy Faircloth began to search the vehicle. (*Id.*)

Before returning to the Suburban to join Deputy Faircloth in the search, Deputy Winstead asked Dickinson several questions: (i) whether he lived on Vera Drive (Hr'g Tr. 15, 63–64); (ii) whether he had anything that could hurt Deputy Faircloth (Hr'g Tr. 15, 63); and (iii) what was in the plastic container in the rear seat (Hr'g Tr. 17, 62). Dickinson admitted to Deputy Winstead that there was a small amount of marijuana in the plastic container, and denied living on Vera Drive. (Hr'g Tr. 15, 17.) Deputy Winstead left Dickinson—unrestrained—and returned to the Suburban to conduct the search with Deputy Faircloth. (Hr'g Tr. 69.) Dickinson was placed in custody after contraband was located in the Suburban. (*Id.*)

The stop and search of the Suburban by Deputies Faircloth and Winstead lasted less than five (5) minutes. (Hr'g Tr. 69, 77–79; Def. Ex. 5.)

The search revealed (i) hydrocodone pills in the unlabeled prescription bottle found on the floorboard; (ii) a handgun stuffed between the driver and passenger seats; (iii) two magazines for firearm ammunition with rounds, found on the dashboard and floorboard; and (iv) marijuana, alprazolam (Xanax) pills, and a small amount of methamphetamine in the blue plastic container on the rear seat. (Hr'g Tr. 17, 95.)

After the search, Deputy Winstead conducted a criminal background check on Dickinson and learned that Dickinson had previously been convicted of a felony. (Hr'g

9

Tr. 19.) Dickinson was then cited for the left-of-center violation (Hr'g Tr. 27; Gov't Ex. 2) and arrested for drug possession and possession of a firearm by a convicted felon (Hr'g Tr. 31). The Suburban was registered to Dickinson. (Def. Ex. 3.)

Deputy Abate arrested Dickinson on September 27, 2016, pursuant to the above-named federal indictment of Dickinson. (Hr'g Tr. 125.) Dickinson was not incarcerated on that day due to being released on bond for state charges related to the incident on February 27, 2016. (*Id.*) Deputy Abate and two other law enforcement agents interviewed Dickinson that day. (*Id.*) Deputy Abate advised Dickinson of his *Miranda* rights orally and in writing, and Dickinson waived said rights, orally and in writing. (Hr'g Tr. 126–27; Gov't Ex. 4.) Dickinson subsequently made incriminating statements regarding objects seized from the Suburban on February 27, 2016. (Hr'g Tr. 127–28.) Deputy Abate notified the attorney representing Dickinson on the related state charges that Dickinson had been taken into custody on federal charges; it is unclear whether this notification took place before or after Dickinson waived his *Miranda* rights. (Hr'g Tr. 131.)

## DISCUSSION

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures "of their persons, houses, papers, and effects." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Generally, an automobile stop is reasonable if supported by probable cause to believe a traffic violation has been

committed, *id.* at 810, or by reasonable suspicion that criminal activity may be afoot, *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An officer's subjective intentions or ulterior motives are irrelevant to the Fourth Amendment issue. *Id.*; *United States v. Hammond*, 353 F. App'x 877, 879 (4th Cir. 2009) (unpublished) (determining that an officer's motive is irrelevant to a Fourth Amendment claim but may be relevant to an equal protection claim).

After a traffic stop has been effected, the law enforcement officer "may engage 'in ordinary inquiries incident to' the traffic stop," such as checking the driver for his license, registration, insurance, and any outstanding warrants. *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015)). Any unrelated investigation "is permitted under the Fourth Amendment only as long as that activity does not prolong the roadside detention for the traffic infraction." *Id.* "[A]n officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of a traffic stop." *Id.* Prolonging a traffic stop past the time necessary to investigate and cite (if appropriate) the initial traffic violation requires either "consent of those detained or reasonable suspicion of criminal activity." *Id.*; *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008).

Reasonable suspicion requires a police officer to "offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." *Branch*, 537 F.3d at 337 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), and *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

Consent to search is valid when the totality of the circumstances shows that it was knowing and voluntary, and given by a person with authority to consent. *Trulock v. Freeh*, 275 F.3d 391, 401–02 (4th Cir. 2001). The Government must prove valid consent by a preponderance of evidence. *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007). The Government cannot meet this burden by showing mere acquiescence to authority, though. *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968). Once valid consent is given, "a search that falls within the scope of that consent is constitutionally permissible" unless and until it is revoked. *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012). Whether consent to search was knowing and voluntary under the totality of the circumstances is a factual inquiry to which the characteristics of the person giving consent and the surrounding conditions are relevant. *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc).

### A. Traffic Stop

North Carolina law requires drivers to maintain the lane of travel. *See* N.C. Gen. Stat. § 20-146(d). Readily observable crossing of the center line on a public road can suffice for probable cause to believe a violation of § 20-146(d) has occurred. *See United States v. Gallardo-Gonzalez*, 331 F. App'x 255, 257 (4th Cir. 2009) (per curiam) (unpublished) (citing *State v. Baublitz*, 172 N.C. App. 801, 806, 616 S.E.2d 615, 619 (2005)); *United States v. Sessoms*, No. 2:14-CR-1-FL-1, 2014 WL 5822865, at *7–8 (E.D.N.C. Nov. 10, 2014) (citing additional unpublished Fourth Circuit cases and published North Carolina Court of Appeals cases).

Here, Deputy Winstead observed Dickinson cross the double-yellow center line on Horseshoe Bend Road twice during the early morning hours of February 27, 2016. Such observation suffices for probable cause to believe that Dickinson violated N.C. Gen. Stat. § 20-146(d). Therefore, the resulting traffic stop effected by Deputy Winstead was lawful.

Defendant argues that Deputy Winstead's version of events should not be credited because his report of the incident only mentioned that Dickinson crossed the center line once and went over the railroad tracks at a rate of speed causing the Suburban to jump. (Def. Supp. Brief. Mot. Suppress [DE #30] at 11 (citing Def. Ex. 3).) This argument is unavailing for several reasons. First, Winstead's testimony and incident report are not inconsistent in any material respect. Second, having observed Deputy Winstead testify, the undersigned credits his testimony in this respect. Third, even if Dickinson had only crossed the center line once, that would still have provided Deputy Winstead with probable cause to effect the traffic stop.

### B. Automobile Search

Deputy Winstead observed—contemporaneous with his initiation of the ordinary inquiries incident to the traffic stop—Dickinson leaning away from the driver-side window and an unlabeled prescription medication bottle with small, white objects on the floorboard of the Suburban. Before Dickinson produced his driver's license, Deputy Winstead inquired whether Dickinson was in possession of anything illicit. This question, while unrelated to the underlying reason for the traffic stop, was permitted because it did not prolong the detention for the suspected left-of-center

13

violation. *See Hill*, 852 F.3d at 382. Dickinson responded to Winstead's question in the negative, and then, without further inquiry from either deputy, stated that his person and his vehicle could be searched. This sequence of events happened rapidly, taking no more than a minute.

Dickinson presented no evidence showing that he has certain characteristics which would have made this apparent consent involuntary or unknowing. *Cf. Lattimore*, 87 F.3d at 650. Moreover, contrary to Dickinson's argument (Def. Mot. Suppress at 15), several conditions present during the stop militate against a determination that Dickinson's consent was mere acquiescence to authority: (i) Deputy Winstead identified himself and explained the basis for the stop; (ii) an ordinary request for a driver's license had been made; (iii) neither deputy had drawn their weapons; (iv) both deputies were standing outside of the Suburban; (v) neither deputy had touched Dickinson; and (vi) neither deputy had asked to search Dickinson or his vehicle. *Cf. United States v. Smith*, 30 F.3d 568, 571 (4th Cir. 1994) (valid consent to search automobile where police asked to search but did not draw weapon, threaten the defendant, or touch the defendant).

Deputy Winstead's question, put to Dickinson while he was retrieving his driver's license, does not alter the totality of the circumstances such that a reasonable person in Dickinson's position would have felt compelled to answer and then to immediately consent to a search of his person and his vehicle. Furthermore, the Suburban was registered to Dickinson and he was its sole occupant when the stop occurred. (Def. Ex. 3.) Therefore, the Government has carried its burden to show by

a preponderance of the evidence that Dickinson's consent to search was knowing and voluntary, and that Dickinson had the authority to so consent. *See Trulock*, 275 F.3d at 401–02; *Buckner*, 473 F.3d at 554.

Whether reasonable suspicion supported the deputies' search is of no moment because Dickinson consented to the search, thereby prolonging the initial traffic stop. *See Hill*, 852 F.3d at 382; *Branch*, 537 F.3d at 336.

The subsequent search of the Suburban revealed prescription medication without a prescription, marijuana and methamphetamine, ammunition, and a firearm. The marijuana and methamphetamine provided the deputies with probable cause to arrest Dickinson. A criminal background check revealed Dickinson's prior felony conviction, thus providing probable cause to arrest Dickinson for possession of a firearm having been previously convicted of a felony in violation of N.C. Gen. Stat. § 14-415.1. The entire stop, search, and arrest took less than five (5) minutes. In sum, the traffic stop was justified by probable cause; the vehicle search was justified by valid consent; and therefore, the drugs, firearm, and ammunition discovered in the vehicle were lawfully seized.

### C. Defendant's Arguments

Any argument that the traffic stop and search was unconstitutional because it was pretextual is foreclosed by *Whren*, 517 U.S. at 811–13. Dickinson argues, however, that an officer's pretext for effecting a traffic stop can bear on his credibility. (Def. Mot. Suppress at 7 n.1; Def. Supp. Brief. Mot. Suppress at 11–12.) Dickinson argues, based on the brevity of the stop as evidenced in the dispatch report (Def. Ex.

3), that the stop was pretextual because "such a swift execution of [the] stop could not possibly occur unless the stop was a targeted stop [for a drug investigation]." (Def. Supp. Brief. Mot. Suppress at 12.) Dickinson then urges that his version of events is "more credible" than the Government's because the Government's version of events was based on pretext. (*Id.*)

Having observed the Government's witnesses testify and considered the parties' exhibits, the undersigned credits the Government's version of events and finds the facts as described above. The undersigned finds that the evidence presented by the defense is insufficient to demonstrate that the stop was pretextual or that the Government's witnesses were not truthful in their testimony before the court. Defendant elected[3] not to testify, and his sole witness testified only to the conditions of Horseshoe Bend Road on a later date (which were consistent with conditions as described by the Government's witnesses). He simply argues that the stop must have been pretextual because it happened so quickly, and therefore, the stop did not happen as the Government's witnesses testified. Contrary to Dickinson's argument, the rapid seizure of contraband from the Suburban is explained by Dickinson's quick consent to search and the contraband's location in the vehicle.

Two versions of an incident are not always necessary to determine if one is not credible. The Government's version of events may be so incredible as to undermine

---

[3] Dickinson claims that he "could not take the stand and rebut [the] testimony [of Deputies Winstead and Faircloth]." (Def. Supp. Brief. Mot. Suppress at 13.) Dickinson does not support this assertion, and therefore, the undersigned determines that Dickinson's right to testify was not unconstitutionally impeded.

its own credibility without contrasting a different version of events. *See, e.g., United States v. Wright*, 856 F. Supp. 2d 736, 743–44 (E.D.N.C. 2012) (rejecting argument that the defendant's driving was evasive because the defendant was backing away from a police officer when government witnesses testified that the defendant was both backing away from and towards police officers). Here, though, the Government's version of events is credible, and the defense has failed to demonstrate otherwise. Therefore, Dickinson's argument that the traffic stop was so pretextual as to undermine the Government's entire version of events should be rejected.

D. Statements

Dickinson's statements made several months later to Deputy Abate and other ATF task force officers are not "fruit of the poisonous tree" because the stop, search, and arrest of Dickinson on February 27, 2016, complied with the Fourth Amendment. Therefore, these statements should not be suppressed.

CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that Defendant's Motion to Suppress [DE #22] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **September 5, 2017**, to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or

modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(l); Fed. R. Crim. P. 59(b); Local Crim. R. 1.1 (permitting modification of deadlines specified in local rules), 5.3(c) (E.D.N.C. Dec. 2016).

A party that does not file written objections to the Memorandum and Recommendation by the foregoing deadline, will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, a party's failure to file written objections by the foregoing deadline may bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See United States v. Jones*, 658 F. App'x 188, 189 (4th Cir. 2016).

This 21st day of August 2017.

_____
KIMBERLY A. SWANK
United States Magistrate Judge